## Case No. 5,420.

### GILCHRIST et al. v. COLLECTOR OF CHARLESTON.

[1 Hall, Law J. 429; Brunner, Col. Cas. 249; 5 Hughes, 1.]

Circuit Court, D. South Carolina. May 28, 1808.

MANDAMUS — INSTRUCTIONS FROM THE SECRETARY OF THE TREASURY—COLLECTORS.

The circuit court has power to issue a mandamus to a collector, commanding him to grant a clearance. All instructions from the executive which are not supported by law are illegal, and no inferior officer is bound to obey them.

Embargo. A motion was made by Mr. Ward for rule on the collector to show cause why a mandamus should not be issued against him, to compel the granting of clearances for the ship Resource, Moreton; ship Two Pollies, Wilder; ship Navigator, Bowden; ship Rising States, Anderson; and ship Louisa Cecilia, Fowler, founded on the following affidavit: "Adam Gilchrist and J. S. Barker, of Charleston, merchants, being severally sworn according to law, depose, that the American register ship Resource, arrived from a foreign voyage in the port of Charleston about six months since, owned one half by the deponent, J. S. Barker, residing in Charleston, and the other half by American citizens residing in Baltimore; that the deponent representing the owners aforesaid, apprehensive that the bottom of the ship might, by her being detained here during the embargo, be totally destroyed by worms, did for that reason determine on sending her to Baltimore and regularly advertised for freight to said port of Baltimore; that having obtained the promise and actually engaged the freight of about six hundred bales of cotton, it became requisite to ship either ballast or heavy freight, so as to enable the said ship to be navigated with safety; the ballast not being obtainable, these deponents, about three weeks since, agreed to carry to Baltimore about two hundred barrels of rice, freight free; and that the same was shipped by permit from the custom house and under the inspection of a revenue officer about two weeks since; that on application for a clearance of the said ship and her cargo to Simeon Theus, collector of the port of Charleston, duly commissioned and

authorized to exercise and perform the duties of said public officer or collector of the port aforesaid, he hath refused to grant a clearance to said vessel and cargo, alleging that although he hath no suspicion that the clearance demanded is to cover an ostensible voyage to Baltimore, or to infringe or evade the existing laws relative to the embargo, and although he admits that the said ship was laden previously to his receipt of the act of congress, respecting the embargo, under date of the 25th April, ult. yet that he is bound to refuse such clearance, under the directions of the executive of the United States, which he conceives he is bound to obey; that these deponents have just right under the law to obtain from said Simeon Theus, collector as aforesaid, the clearance so withheld and refused to be granted. Adam Gilchrist. J. Sanford Barker. Sworn before me this 24th of May, 1808. John Ward, Q. U."

Upon the return of the rule the defendant showed the following cause: "United States, South Carolina District. Federal Circuit Court. Ex parte Simeon Theus, Esq., Collector of the Port of Charleston. Rule to show cause why a mandamus should not issue, requiring him to grant clearances of certain vessels. Simeon Theus, collector of the port aforesaid, on whom a copy of the above rule has been served for cause, showeth: That in and by a certain act of congress of the said United States, passed the 25th day of April, 1808 [2 Stat. 501], it is, in the 11th sect. thereof, amongst other things, enacted: 'that the collectors of the customs be, and they are hereby respectively authorized, to detain any vessel ostensibly bound with a cargo to some other port of the United States, whenever, in their opinion, the intention is to violate or evade any provisions of the acts laying an embargo, until the decision of the president of the United States be had thereupon.' Also, that in and by a certain circular letter from the treasury department of the United States, dated the 6th of May, 1808, and addressed to the said Simeon Theus, as collector aforesaid, he is instructed as follows (here follows the circular instructions of Mr. Gallatin). That the said Simeon Theus, collector as aforesaid, doth not detain the vessels as aforesaid, under the act aforesaid, because in his opinion there is no intention in the parties aforesaid to violate or evade any of the provisions of the acts laying an embargo, but that he detains them under the instructions he has received in the letter aforesaid, and which as a public officer he thinks he is bound to obey. That being unwilling, on the one hand, to injure individuals, and, on the other, equally so, to commit a breach of his duty, he submits the question to the court, upon the cause above shown. Simeon Theus, Collector."

The case was then submitted without argument.

Before JOHNSON, Circuit Justice, and BEE, District Judge.

JOHNSON, Circuit Justice. The affidavit, upon which this motion is founded, states, that the ship Resource is ballasted with 140 barrels of rice, under a load of cotton, and is destined for the port of Baltimore. The collector, in his return to the rule, acknowledges, that he believes the port of Baltimore to be her real destination; and that, if he had no other rule of conduct but the 11th section of the act supplementary to the embargo act, he would not detain her; but urges in excuse, for refusing her a clearance, a letter from the secretary of the treasury. It is not denied that if the petitioners be legally entitled to a clearance, this court may interpose its authority, by the writ of mandamus, to compel the collector to grant it. The only questions, therefore, will be, whether the section of the act alluded to, authorizes the detention of the vessel; and if it does not, whether the instructions of the president, through the secretary of the treasury, unsupported by act of the congress, will justify the collector in that detention. On the latter question there can be no doubt. The officers of our government, from the highest to the lowest, are equally subjected to legal restraint; and it is confidently believed that all of them feel themselves equally incapable, as well from law as inclination, to attempt an unsanctioned encroachment upon individual liberty. In the letter alluded to, Mr. Gallatin speaks only in the language of recommendation, not of command; at the utmost the collector could only plead the influence of advice, and not the authority of the treasury department in his justification. In the act of congress there is no ambiguity. The object is to prevent evasions of the embargo act, by vessels which sail ostensibly for some port in the United States, when their real destination is to some other port or place. The granting of clearances is left absolutely to the discretion of the collector; the right of detaining in cases which excite suspicion is given him, with a reference to the will of the executive. Congress might have vested this discretion in the president, the secretary of the treasury, or any other officer, in which they thought proper to vest it; but, having vested the right of granting or refusing in the collector, with an appeal to the president only in case of refusal—the right of granting clearances remains in him unimpaired and unrestricted.

It does not appear to us that the instructions from the treasury department are intended to reach this case. The recommendation not to grant clearances on shipments of provisions appears by the context to be restricted by two provisos, evidently pointed at by the reasons assigned for that recommendation. First, if intended for a place where they are not wanted for consumption, or we suppose, where supplies of the same article can be had from the state or neighbourhood in which such place is situated. Secondly, for a port that usually exports that

article. Now with regard to the article of rice, it is impossible to say how much the city of Baltimore will want for its consumption, as they have no internal supplies, and as the three Southern states alone are exporters of that article. Shipments of rice from Baltimore to Charleston might create suspicion, but not such shipments from Charleston to Baltimore. We are of opinion that the act of congress does not authorize the detention of this vessel. That without the sanction of law, the collector is not justified by the instructions of the executive, in increasing restraints upon commerce, even if this case had been contemplated by the letter alluded to; but that from a temperate consideration of that letter, this case does not appear to come within the spirit and meaning of the instructions which it contains.

A mandamus was ordered accordingly, commanding the collector to grant a clearance to the Resource.

Letter from the attorney general to the president of the United States, relative to the proceedings of the circuit court of South Carolina in the case of The Resource:

Sir: I have read and considered the papers and documents referred to me relative to the case of a mandamus, issued by the circuit court of the United States for the district of South Carolina, to compel the collector of the port of Charleston to grant clearances to certain vessels. The first question that naturally presents itself, is, whether the court possessed the power of issuing a mandamus in such a case. A mandamus in England is styled a "prerogative writ," and in that country is awarded solely and exclusively by the court of king's bench. The constitution and laws of the United States establish our judicial system. To these we must refer, in order to ascertain the jurisdiction of the respective courts, the extent of their powers, and the limits of their authority. The "act to establish the judicial courts of the United States," passed the 24th September, 1789 [1 Stat. 73], declares and defines the jurisdiction of the several courts thereby created, and among these the jurisdiction of the circuit courts. Upon a careful and attentive perusal. it will be found to delegate to the circuit courts no power to issue writs of mandamus. In the thirteenth section of that act, this authority is expressly given to the supreme court of the United States. In like manner it is specially provided by the act of the 3d February, 1801, that the supreme court shall have power to issue writs of mandamus. This last act having been repealed and the former revived, the question must rest on the true construction to be given to the original act. The eleventh section defines and limits the jurisdiction of the circuit courts. It is specially appropriated to this single object. There are no expressions in this section which can fairly be interpreted to confer the au-

thority of issuing writs of mandamus; nor can the power be either implied or inferred from any language it contains. It is true, the proceeding by mandamus in England is on the crown side, as it is termed, of the court of king's bench. But it is a prosecution relative to a civil right to enforce it, and to obtain prompt redress; and not to punish criminally as in the case of an offence. The provision therefore that the circuit courts "shall have exclusive cognizance of all crimes and offences cognizable under the authority of the United States, except where the act otherwise provides," &c. cannot warrant such a proceeding. Besides, the same act does provide that the supreme court shall issue writs of mandamus. An authority given, perhaps, because its jurisdiction extended all over the United States. The fourteenth section, immediately succeeding that which gives this authority, in plain and positive terms, to the supreme court, solely, if not exclusively, (and the affirmative frequently, and in this case justly, I think, implies a negative) contains the following provision. "All the before mentioned courts of the United States, (including the supreme as well as the circuit and district courts) shall have power to issue writs of scire facias, habeas corpus, and all other writs not specially provided for by the statute, which may be necessary for the exercise of their respective jurisdictions." This clause cannot affect the case, I conceive. The mandamus is a writ which, we have seen, is specially provided for by law. This section was evidently not designed to give any additional jurisdiction to either of the courts, but merely the means of executing that jurisdiction already granted to them respectively. The issuing of a mandamus in the case under consideration was an act of original jurisdiction. Precisely as much so, as it would have been in the supreme court, to have exercised the power in the case of Marbury v. Madison [1 Cranch (5 U. S.) 137]. In that case the supreme court declared, that to issue a mandamus to the secretary of state, would be, to exercise an original jurisdiction, not given by the constitution; and which could not be granted by congress. The constitution having enumerated or declared the particular cases in which the supreme court should exercise original jurisdiction, though there were no negative expressions, the affirmative, they considered, implied them. It was on this principle alone they refused to exert their authority.

The practice, I believe. has uniformly been, so far as I can trace it from the books of reports that have been published, or from recollection and experience on the subject, to apply to the supreme court for a mandamus. This court it is true have determined not to issue the writ, when it would be an act of original jurisdiction. But this I apprehend, can afford no ground for the circuit court's assuming an authority which the supreme court have declined, unless by a legislative act the

power be delegated to them. This power is not inherent nor necessarily incidental to a court of justice, even of general jurisdiction. For in England but a single one, of several courts having general jurisdiction, possesses the authority. Neither the chancery, the common pleas, nor the exchequer, though classed among the king's superior courts and having general jurisdiction over the realm, can exercise this power. It is the peculiar privilege of the king's bench alone. Our circuit courts have merely a local and subordinate jurisdiction. Their analogies therefore with the four courts of England, having general and superior jurisdiction, must be very weak, and still weaker their claim to the preeminent distinction of the king's bench, which possesses solely the exclusive authority of issuing the mandamus. For these reasons I am induced to believe from the best consideration I have been enabled to give the subject, that the circuit court of South Carolina had no authority to issue a mandamus to the collector of the port of Charleston.

It is scarcely necessary to remark, that when a court has no jurisdiction, even consent will not give it; and much less will the mere tacit acquiescence of a party, in not denying their authority. Independent of this serious and conclusive objection to the proceeding adopted by the court there are others entitled to consideration. For supposing the court did not err in the exercise of jurisdiction, and admitting the British doctrines on the subject without restriction or limitation could be extended to this country, there are legal exceptions to the course they have pursued, supported by English authority. In the first place, the law gave the collector complete discretion over the subject. According to the opinion he might form, he possessed competent authority to grant or refuse a clearance. And I apprehend where the law has left this discretion in an officer, the court, agreeably to the British practice and precedents, ought not to interpose by way of mandamus. Secondly. In this case there was a controlling power in the chief magistrate of the United States. There was in fact, an express appeal given to the president by the very words of the act of congress, which authorizes the collectors to detain vessels "until the decision of the president of the United States be had thereupon." By the mandamus the reference to the president is taken away; and the collector is commanded to clear the vessel without delay. Agreeably to the English authorities under such circumstances, it is not the course I believe to issue a mandamus. Thirdly. The parties, it seems, had their legal remedy against the collector; and it is not usual if not unprecedented, to grant a mandamus in such a case. Fourthly. A mandamus is not issued to a mere ministerial officer to compel him to his duty. The court will leave the parties to their remedy by action, or even by indictment. In England, in a very late case, they decided that they would not grant a mandamus to a ministerial officer, such as the treasurer of a county; for the proper remedy was by indictment. I am aware of a precedent, in which it seems to be admitted, that a mandamus may issue to the commissioners of excise, to compel them in a proper case to grant a permit. This case is more analogous to the one now before us than any other I have been able to discover, after a diligent research. But in this instance the point was not made, nor the question argued. Besides the commissioners of excise in England form a board for superintending the collection of that branch of the revenue. They constitute in many respects a court of inferior jurisdiction, which in particular cases takes cognizance in a summary way, of offences against the excise laws. A mandamus might be granted to such a tribunal when it would not be issued to a mere ministerial officer, acting under them in the collection of the revenue.

It results from this view of the subject, that the mandamus, issued by the circuit court for the district of South Carolina, was not warranted by any power vested in the circuit courts by statute, nor by any power necessarily incident to courts, nor countenanced by any analogy between the circuit courts, and the court of king's bench: the only court in that country possessing the power of issuing such writs. And it further appears, that even the court of king's bench, for the reasons assigned, would not agreeably to their practice and principles, have interfered in the present case by mandamus. It might perhaps with propriety be added, that there does not appear in the constitution of the United States any thing which favours an indefinite extension of the jurisdiction of courts, over the ministerial officer within the executive department. On the contrary, the careful discrimination which is marked between the several departments should dictate great circumspection to each, in the exercise of powers having any relation to the other. The courts are indubitably the source of legal redress for wrongs committed by ministerial officers; none of whom are above the law. This redress is to be administered by due and legal process in the ordinary way. For there appears to be a material and obvious distinction, between a course of proceeding which redresses a wrong committed by an executive officer, and an interposition by a mandatory writ, taking the executive authority out of the hands of the president, and prescribing the course, which he and the agents of any department must pursue. In one case the executive is left free to act in his proper sphere, but it is held to strict responsibility; in the other all responsibility is taken away; and he acts agreeably to judicial mandate. Writs of this kind if made applicable to officers indiscriminately, and acts purely ministerial and executive in their nature, would necessarily have the effect of transferring the powers vested in one department to another department. If in a case

like the present, where the law vests a duty and a discretion in an executive officer, a court can not only administer redress against the misuse of the authority, but previously direct the use to be made of it, it would seem that under the name of a judicial power, an executive function is necessarily assumed, and that part of the constitution perhaps defeated, which makes it the duty of the president to take care that the laws be faithfully executed. I do not see any clear limitation to this doctrine, which would prevent the courts from compelling by mandamus all the executive officers; all subordinate to the president at least, whether charged with legal duties in the treasury or other department, to execute the same according to the opinion of the judiciary and contrary to that of the executive. And it is evident that the confusion arising will be greatly increased by the exercise of such a power by a number of separate courts of local jurisdiction, whose proceedings would have complete and final effect, without an opportunity of control by the supreme court. So many branches of the judiciary, acting within their respective districts, their courses might be different; and different rules of action might be prescribed for the citizens of the different states, instead of that unity of administration which the constitution meant to secure by placing the executive power for them all, in the same head. What, too, becomes of the responsibility of the executive to the court of impeachment, and to the nation? Is he to remain responsible for acts done by command of another department? or is the nation to lose the security of that responsibility altogether? From these and other considerations, were this branch of the subject to be pursued, it might be inferred, that the constitution of the United States, by the distribution of the powers of our government to different departments, ascribing the executive duties to one, and the judiciary to another, controls any principles of the English law, which would authorize either to enter into the department of the other, to annul the powers of that other, and to assume the direction of its operations to itself.

These remarks are respectfully submitted to your consideration. They are made with due deference to the opinion of the court; with one of the judges constituting which, I am personally acquainted, and for whose character I feel the sincerest regard. Yours, very respectfully, (Signed) C. A. Rodney.

The President of the United States. July 15th, 1808.

Judge JOHNSON'S remarks on the publication of the attorney general's letter to the president, on the subject of the mandamus issued by the circuit court of South Carolina to the collector, in the case of The Resource:

Edgefield District, 26th August, 1808.

In a Charleston paper, received by the last mail, I have perused a letter addressed by the attorney general of the United States to the president, relative to the proceedings of the circuit court of South Carolina, in the case of The Resource. That the president should have consulted that officer upon a legal subject, is perfectly consistent with the relation subsisting between their respective stations; and as long as the result of that consultation was confined to the cabinet, there had occurred nothing inconsistent with the relation between the executive and judicial departments. But when that opinion is published to the world, under the sanction of the president, an act so unprecedented in the history of executive conduct could be intended for no other purpose than to secure the public opinion on the side of the executive and in opposition to the judiciary. Under this impression I feel myself compelled, as the presiding judge of the court, whose decision is the subject of the attorney general's animadversions, to attempt a vindication of, or at least an apology for that decision. So long as its merits were the subject of mere newspaper discussion, I felt myself under no concern about the opinion that the public might form of it. The official acts of men in office are proper subjects for newspaper remarks. The opinion that cannot withstand a free and candid investigation must be erroneous. It is true that a judge may, without vanity, entertain a doubt of the competency of some of the editors of newspapers to discuss a difficult legal question; yet no editorial or anonymous animadversions, however they may have been characterized by illiberality or ignorance, should ever have induced me to intrude these observations upon the public. But when a bias is attempted to be given to public opinion by the overbearing influence of high office, and the reputation of ability and information, the ground is changed; and to be silent could only result from being borne down by weight of reasoning or awed by power. I should regret exceedingly should I err in attributing to the president the publication of the attorney general's letter. I do so because, from the nature of the case, it is impossible to think otherwise. There is no reason to suppose that the attorney general would have published it at all; or at least not without the command or permission of the president. That the attorney general should have formed conclusions differing from those of the court, is the most natural thing imaginable. It proceeds from the assumption of erroneous premises. The writ of mandamus in a case analogous to that of The Resource is not provided for by law. The collector had not an unlimited discretion in granting or refusing a clearance. There was not a general appeal to the will of the chief magistrate. Nor does the court found its right to issue the mandamus upon an analogy drawn from the courts of Great Britain. Upon the affirmation of these propositions the opinion of the attorney general ap-

pears to be predicated. In addition to which he would seem to have misapprehended the purport of the decision of the supreme court in the case of Marbury v. Madison [1 Cranch (5 U. S.) 137], and to have drawn reasons from inconvenience, which may prove a great deal too much for the public security; and which have already met with the disapprobation of the supreme court in the before mentioned case. A concise history of the case of The Resource is indispensably necessary in pursuing the subject.

In order to prevent evasions of the laws prohibiting foreign intercourse, congress found it necessary to grant certain powers to the collectors, by which they might detain vessels, clearing out for a port of the United States, when their real destination was to some foreign port or place. For this purpose was passed the following clause of the act of April 25th of the present year: "Sec. 11. And be it further enacted, that the collectors of the customs be and they are hereby respectively authorized to detain any vessel ostensibly bound with a cargo to some other port of the United States, whenever in their opinions, the intention is to violate and evade any of the provisions of the acts laying an embargo, until the decision of the president of the United States be had thereon."

This clause, although from a superficial view it may seem otherwise, really authorizes no restraint whatever upon the commercial intercourse of the several states, or of any state within itself. It is not a vessel really bound from one port or place in the United States to another, that the collector is authorized to detain, for that is no violation of the embargo act; but those which are only ostensibly bound from one port to another, within the United States when their real destination is to some other port or place, or to do some act in violation of the laws imposing an embargo. I assume it as an incontestable proposition, that every inhabitant of the United States has a perfect right to carry on commerce from one port to another, unless restricted by law; that no officer of our government can legally restrict him in the exercise of that right, except in cases specified by law. I would as soon attempt to prove his right to the air that he breathes, or the food that he consumes, as to support these doctrines by a course of reasoning; nor is it less clear, that in all cases of uninterdicted commerce, the collector is bound to grant a clearance whenever the forms imposed by law have been complied with. It is the obligation on him correlative to the right of the citizen. Upon an attentive and candid perusal of the foregoing clause, (which is the only one upon this subject) it is impossible for the mind to refuse its assent to the following propositions: (1) That it gives no power to the president to order a detention in any case. (2) That it authorizes the collectors to detain in one specified case, and that only,

viz. whenever, in their opinion, the intention is to violate, and evade any of the acts laying an embargo. (3) That the only case, in which the law authorizes the president to act upon the subject, is, when the collector having detained a vessel, a reference is made to the president for his decision on the correctness of the grounds of such detention. (4) That the discretion in granting clearances is absolute in the collector, in the first instance; and only results to the president in case of the collector's refusal. From which it will follow that the president could not prescribe to him a line of conduct in granting clearances which was inconsistent with his own judgment; and, in fact, it will be found that the only effect in granting the mandamus in the case of The Resource was to secure to the collector the exercise of the power vested in him by the foregoing section, and to the citizen the benefit of the collector's being released from a restraint which the law did not impose on him.

On the 6th May, 1808, the secretary of the treasury addressed to the collector of the port of Charleston the following letter: "Sir: I informed you in my letter of the 23th ultimo, that the president considered unusual shipments, particularly of flour and other provisions, of lumber and of naval stores, as sufficient causes for the detention of the vessel. Pot and pearl ashes and flaxseed, ought to have been added to the list; but he has given it in charge to me, to call your attention still more forcibly to that object; as it was the great and leading object of the legislature in giving the power of detention, he considers it his duty, in the execution of it, to give complete effect to the embargo laws. He recommends therefore that every shipment of the above articles, for a place where they cannot be wanted for consumption, should be detained," &c. &c.

The Resource was one of a number of vessels that were loaded and waiting in the port of Charleston, to sail as soon as the embargo should be raised; her cargo consisted of rice and cotton. About the month of June, it is well known that in that port the worm is peculiarly destructive to vessels' bottoms. This induced the merchants generally, about that time, to adopt the resolution to despatch their vessels to some Northern port, where they might escape the ravages of this destructive insect. Upon the collector's refusing to grant a clearance to any vessel, the cargo of which consisted in any part, however small, of provisions (pursuing the strict letter of his instructions) application was made to the court for a mandamus, on an affidavit stating the above facts; and a rule was granted without opposition. Upon the return of the rule the collector expressly declared that, in his opinion, the Resource had no intention to violate or evade any of the provisions of the acts laying an embargo, but urged the secretary of the treasury's letter to him, as the sole ground of his refusal

to grant a clearance. It is easy to perceive the embarrassment into which this officer was thrown. On the one hand, he must have been sensible of the impropriety of detaining a vessel on pretence of a suspicion which he did not and could not entertain; that the wanton and injurious exercise of even a legal discretion would subject him to damages; and that the amount, to which he must render himself liable in this case, was infinitely beyond any thing he was able to pay; as the merchants threatened to throw their vessels upon his hands. He may also have felt that sentiment of injury which affects the mind of every one upon the undue restriction of the exercise of his own faculties. But on the other hand, as he held his office absolutely at the will of the executive, acquiescence was necessary; although ruin threatened him, and no prospects of indemnity could possibly present themselves. In this situation he made his statement of the foregoing circumstances, and submitted the case to the court, through the district attorney, without argument. Upon the return of the rule, the court particularly called upon the United States' attorney, to say if he contested the power of the court to proceed by way of mandamus in the case before them. He replied that he could make no objection. The high respect in which that gentleman's talents and information are held would be at least an apology for any court's proceeding in that mode, upon his acquiescence. Under these circumstances, when every point was conceded, except whether the instructions of the president could authorize a detention in a case not comprised within the law of congress, the court did not, could not hesitate to decide that. to detain a vessel, because, in his opinion, her intention was to evade the embargo laws, when he avowed his opinion to be otherwise, was an absurdity in terms; that if the act of congress did not authorize the detention of the vessel, the instructions of the president could not sanction it; and as the remedy by an action for damages was very inadequate to the full vindication of the rights of the petitioner, a mandamus should issue. The court went further, and observed that the instructions, upon which the collector relied, did not appear to have been intended to reach the case before them; and if they did, they were only in the language of recommendation and not of command; so as to leave the collector still at liberty to exercise that discretion which the law had given him. But in these latter remarks, there is every reason to think that they misapprehended the intention of the executive; as the publication of Mr. Rodney's letter may be viewed as a full avowal that the case of The Resource was contemplated by the executive; and that a recommendation was expected to operate upon the dependent situation of the collector with the weight of a command. From which it would result, that every power, given to an officer removable at the will of the executive, is given to the executive.

In pursuing my remarks on the attorney general's letter, I feel an embarrassment, resulting from what I hope he will excuse me for denominating a want of precision of language. Jurisdiction in a case is one thing: the mode of exercising that jurisdiction is quite another. That the court possessed jurisdiction over the case between the parties before them, is admitted by the attorney general, when he supposes that the owner of the Resource may have maintained his action against the collector for an illegal detention. The language of his tenth paragraph supposes a total and absolute defect of jurisdiction; while that of some of the paragraphs preceding it seems to imply that the impropriety lay in the mode of process by which the court exercised that jurisdiction. To avoid, however, all ambiguity and the charge of misapprehension or misstatement of the argument, I will direct my observations to three points, which must embrace the whole subject: (1) The jurisdiction of the circuit court. (2) The power of that court to issue the mandamus, in the exercise of that jurisdiction. (3) The propriety of issuing it in the case of The Resource.

The jurisdiction of the court, as is properly observed by the attorney general, must depend upon the constitution and laws of the United States. We disclaim all pretensions to any other origin of our jurisdiction, especially the unpopular grounds of prerogative and analogy to the king's bench. That judicial power, which the constitution vests in the United States, and the United States in its courts, is all that its courts pretend to exercise. In the constitution it is laid down, that "the judicial power of the United States shall extend to all cases in law or equity, arising under this constitution and laws of the United States, and treaties made, or which shall be made," &c. The term "judicial power" conveys the idea, both of exercising the faculty of judging and of applying physical force to give effect to a decision. The term "power" could with no propriety be applied, nor could the judiciary be denominated a department of government, without the means of enforcing its decrees. In a country where laws govern, courts of justice necessarily are the medium of action and reaction between the government and the governed. The basis of individual security and the bond of union between the ruler and the citizen must ever be found in a judiciary sufficiently independent to disregard the will of power, and sufficiently energetic to secure to the citizen the full enjoyment of his rights. To establish such a one was evidently the object of the constitution. But to what purpose establish a judiciary, with power to take cognizance of certain questions of right, but not power to afford such redress as the case evidently requires? Suppose congress had vested in the circuit court a certain jurisdic-

tion, without prescribing by what forms that jurisdiction should be exercised; would it not follow that the court must itself adopt a mode of proceeding adapted to the exigency of each case? It must do so, or refuse to act. One thing, at least, cannot be denied: that the power of congress was competent to authorize the circuit court to issue the writ of mandamus. From this it would follow, that issuing that writ is a mere incident to the judicial power, and not in itself a distinct branch of jurisdiction; for the constitution nowhere expressly vests in the United States the power to issue that writ, or any other. And if a mere incident, I see no reason why it should not follow with the principal jurisdiction, when vested by congress in its courts. If it were necessary to appeal to analogy, to justify any exercise of jurisdiction, it would be easy to show that the supreme court of the United States bears a stronger analogy to the court of exchequer, or that of parliament, than the court of king's bench; and that if there exist any analogy between any of the courts of the United States and those of Great Britain, it is between the court of king's bench and the latter, and the circuit court of the former government; the union of criminal and civil, and of original and appellate jurisdiction, marks the similarity of the latter. But it is wholly unnecessary to recur to any other authority than what is given us by the constitution and laws of the United States, as the constitution defines in what cases, and between what description of persons our courts may exercise jurisdiction; and the form or mode of process is sufficiently settled by acts of congress. That description of cases, under which the present must be arranged, is, cases arising under the laws of the United States. If it be a question of right arising under the laws of the United States, it is one of those to which the judicial power of the United States extends, and for which they were bound to administer a remedy; not one that would mock the hopes and just expectations of the individual, but an adequate and efficient remedy. I deem it unnecessary to enter into a critical examination of the acts of congress on the question, whether jurisdiction in cases arising under the laws of the United States is delegated to the circuit courts. The inveterate exercise of that jurisdiction under the sanction of the supreme court is the authority I appeal to.

2. In considering the power of the court to issue the writ of mandamus in the exercise of its jurisdiction, the attorney general cannot demand greater fairness than to be met on his own principles. His argument is, that the power given to the circuit court relative to the issuing of writs (except as to two particularly named) extends only to writs not specially provided for by law. That the power to issue the writ of mandamus is by law vested in the supreme court, and therefore is provided for by law.

Here nothing but my frequent experience of that gentleman's habitual candour prevents me from charging him with unfairness; or perhaps he really misapprehended the purport of the decision of the supreme court in the case of Marbury v. Madison [supra], as upon no other suppositions could he have used this argument. In that case the court did not decide, as the attorney general seems to suppose, that issuing a mandamus was an exercise of jurisdiction not within the scope of the judicial powers of the United States. On the contrary, they expressly declare the power and the propriety of the courts issuing it in many cases which may occur. But except in cases where a foreign minister or a state is a party, the supreme court is restricted to the exercise of an appellate jurisdiction; and its decision was, that the act of congress, so far as it was intended to vest that court with power to issue the writ of mandamus in a case partaking of the nature of original jurisdiction, was unconstitutional and void. A void law I presume is no law; and it would follow therefore that the writ of mandamus, in those cases of original jurisdiction, which cannot constitutionally be submitted to the supreme court, comes fully within the description of a writ not otherwise provided for by law. Certain it is that if the circuit court of this state could not issue this writ in the case of The Resource, there was no legal provision by which the benefit of it could have been extended to her owner. The supreme court could never have exercised jurisdiction over the question of right between the parties in that case, except upon appeal. Whatever suit or action was proper on the occasion, was by the constitution confined to the other tribunals in the first instance. But the right of the court to issue this writ does not wholly rest here. There is another act in force (although not to be found in Graydon's Digest) which appeared to authorize, nay to oblige us to issue the writ of mandamus. The act of congress, commonly called the process law, enjoins on the courts of the United States to conform their practice to that of the several states in which they sit. I am aware that in technical language the term "process" (which is the word used in that law) includes only those acts which take place between the institution and conclusion of an action. But whoever peruses this act, will find on the face of it strong reasons for indulging it with a construction conforming to the vulgar use of the term "process." In fact, it affords incontestable evidence that the legislature understood the term "process," as embracing the whole scope of judicial proceedings. The title of the act is, "an act to regulate judicial process in the courts of the United States"; and the first line of it mentions writs as a proceeding included under this general head. Executions also are objects of the act, as well as proceedings in the equity and admi-

ralty courts. The correct, legal and received construction of this act therefore is, that the forms and modes of administering justice, the remedies to be applied to the rights which are committed to our jurisdiction shall be such as are used and allowed in the supreme courts of the states over which we respectively preside. Now I do assert (and my opportunities of information on this subject will justify my pretending to some authority) that in a case analogous to that of The Resource, the mode of proceeding in the state courts of South Carolina is by mandamus. Thus then stood the case: The owner of the Resource had an unquestionable right to a clearance: a right which is acknowledged by the collector himself (and not even denied by the attorney general). He applies to the court to vindicate this right. That he was entitled to redress could not be doubted. In what form was that redress to be administered? The process law directs our inquiries to the practice of the state of South Carolina. By the practice of that state, the process is by mandamus. It is said, the party may have been left to his action for damages; but would this have been putting him in possession of his right? It would have been an arbitrary substitution of a compensation instead of his right; and both in practice and theory would not have amounted to complete justice. There are rights which perish in the violation. These will admit of no other remedy; nor will the law allow any other redress for the acts of mere individuals. But for rights which continue to exist, notwithstanding their violation, and the violation of which is committed under semblance of sovereign authority, the dignity of the government, as well as the security of the citizens, requires an additional remedy. If in the construction of the act last noticed, it should be thought that I have given it a latitude not intended by the legislature, my reply is, that I can discover no other construction that will not totally annihilate its operation. The act prescribes certain terms and modes of process; but it would be as rational to suppose the existence of form without substance, as that these forms and modes of process could be adopted without relation to the cases in which they are known and practised in the several states. Should the want of technical precision in these acts have involved the court in error, the reply is, that the introduction of philological correctness into our laws at some stage of their progress would save the courts much trouble and much odium. This might be done before they pass from the hands of the executive.

3. In considering the third and last question, viz. the propriety of issuing a mandamus in the case of The Resource, it will be found that the four grounds of the attorney general admit of a brief and very satisfactory answer. The first is, "that the law gave the collector complete discretion over the subject." The fact is otherwise. The discretion of the collector was limited to a particular case: that of his entertaining suspicion which he himself admits could not be entertained with regard to the Resource. Or it may be answered thus: the instructions of the executive deprived him of that discretion. The mandate of the court obliged him to act according to the dictates of his own judgment, to which the law of congress had committed the interest of his fellow citizens, and not surrender a right of judging, which must ever be entirely personal; and which we can never know by what motive congress may have been influenced in vesting in him, instead of any other officer of government. The second argument is, "that there was a controlling power in the chief magistrate of the United States." This is equally incorrect in the extent in which it has been laid down, and in which alone it would answer the purpose of the attorney general. The fact is, as has been before shown, that the power of the president to act upon the subject was confined to the particular case of a reference to him upon a previous detention by the collector; and did not authorize the president to prescribe to the collector in what cases he should detain. In cases where the collector had detained upon suspicion, on the dictates of his own judgment, the president could oblige him to discharge, but was not authorized to control him generally, in the exercise of the right of granting clearances in the first instance. Nothing was easier than for congress to have declared that the president should dictate generally to the collector upon this subject, if such had been their intention. This would have been giving the executive that latitude of power which was necessary to justify their instructions to the collector, but which cannot be extorted from the law under which they acted. With regard to the third argument, "that the parties had their legal remedy against the collector," I can assure the attorney general that it is both usual and precedented for courts to issue the writ of mandamus notwithstanding that circumstance, when that remedy is not adequate to the ends of justice and good government. In some cases, to save a party the necessity of pursuing a remedy in equity, or a remedy in its nature too tedious, this writ has been issued. The Case of Commissioners of Excise in 2 Term R. 381, of which the attorney general is aware (and with his own answer to which I think I perceive that he is not satisfied), might have convinced him that this argument could not be relied on; for there also the action for damages might have been maintained. The total inadequacy of this action to the ends of justice in this case will be strikingly perceived if we reflect on the impossibility of finding any criterion by which to estimate the loss consequent upon the disappointment of a mercantile adventure, and how very incompetent the collector must individually have been to discharge the immense amount

of damages which might have been awarded against him; especially as individuals could derive no indemnity from his bond to the government. Indeed the action for damages is, at best, but a poor dependence and but a substitute for more ample justice. The fourth and last ground relied on by the attorney general is, that the courts of Great Britain will not issue a mandamus to a mere ministerial officer, such as a county treasurer, to compel him to a discharge of duty. This was the case of The King v. Brestow, reported in 6 Term R. 168; but surely in order to point the argument founded on this case it was incumbent on the attorney general to have shown what analogy exists between the two officers of county treasurer and collector of the port of Charleston; and as the reason of the decision in The King v. Brestow was that the treasurer was punishable by indictment, it would seem that it should be shown by what authority this court could have proceeded against the collector in a similar manner. Had such a power existed in the court it would still have been a farce to institute a prosecution for an offence which the president could and most certainly would have pardoned even before conviction. That an office is merely ministerial, is in fact no objection to the issuing of a mandamus; nor is it made, so far as I can recollect (for I have not the case before me), in The King v. Brestow. It would be difficult to find a reason why, if the court can issue this process at all against public officers, it should not compel them to do justice to the citizens in a ministerial as well as a judicial capacity. In cases of direct subordination or accountability to some specified jurisdiction, the court will not interpose the authority of this writ. That circumstance removes the necessity for lending its aid; and it is against the officer of government that it issues, not against the mere agent of that officer, whose acts are the acts of his principal.

As the attorney general lays much stress on the idea of the collector's being a mere ministerial officer, it is to be regretted that this argument was not attended with some analysis or exposition of that term. I know of no precise technical signification attached to the word "ministerial," except in contradistinction to "judicial." In its ordinary meaning it is rendered "attendant, acting at command, acting under superior authority." In neither of these senses is it properly applicable to the office of collector. His functions are among the most important exercised by any officer of the United States, and call for the frequent exercise of his own will, judgment and discretion. He is at least as far from being merely ministerial, as the commissioners of excise. If the office of the collector be merely ministerial (in the sense in which the attorney general appears to use the term) he must be the officer of the president or the treasury depart-

ment, and not of the United States. The president or secretary of the treasury must be individually and personally responsible for his civil acts. But the contrary is abundantly evident; for his duties are immediately assigned him by law. According to a just construction of that law, he must frame his conduct; and no instructions from the president or secretary of the treasury, (although founded on the attorney general's opinion) can be pleaded by him in justification, except in the single instance of an action on his own bond by the government. At least, so far as his duties are assigned him by law, and not left to be assigned him by the treasury or executive department, his office is not merely ministerial. Some other observations of the attorney general remain to be noticed, viz. that in giving redress by the process of mandamus, the courts may extend their claim to jurisdiction, to a general usurpation of power over the ministerial officers in the executive department; that it is a mode of proceeding which takes away from the government the benefit of appeal, and interferes with the responsibility to which officers of government are subject by impeachment. With regard to the first of these observations, it is evident that the attorney general mistakes the object against which his complaint should be directed. The courts do not pretend to impose any restraint upon any officer of government, but what results from a just construction of the laws of the United States. Of these laws the courts are the constitutional expositors; and every department of government must submit to their exposition; for laws have no legal meaning but what is given them by the courts to whose exposition they are submitted. It is against the law, therefore, and not the courts, that the executive should urge the charge of usurpation and restraint: a restraint which may at times be productive of inconveniences, but which is certainly very consistent with the nature of our government: one which it is very possible the president may have deserved the plaudits of his country for having transcended, in ordering detentions not within the embargo acts, but which notwithstanding it is the duty of our courts to encounter the odium of imposing. Let us take this argument together with that which relates to the liability of officers to impeachment. and some others which are used by the attorney general, into one view; and to what conclusions do they lead us? The president is liable to impeachment; he is therefore not to be restrained by the courts. The collector and every other officer, with equal propriety, who holds his office at the will of the president, are his agents, mere ministers of his will; therefore they are not to be restrained by the process of the courts. The power given to them is power given to him; in subordination to his will they must exercise it. He is charged with the general execution of

the laws; and the security of the citizen lies in his liability to impeachment, or in an action for damages against the collector. This would indeed be an improvement on presidential patronage. It would be organizing a band, which in the hands of an unprincipled and intrepid president (and we may have the misfortune to see such a one elevated to that post) could be directed with an effect, but once paralleled in history. If these arguments have any force at all, as directed against the correctness of the circuit court's issuing the writ of mandamus, they would have equal weight to prove the impropriety of permitting them to issue the writ of habeas corpus; which is but an analogous protection to another class of individual rights, and might be urged to show that the whole executive department, in all its ramifications, civil, military and naval, should be left absolutely at large, in their conduct to individuals. What benefit results to the ruined citizen from the impeachment of the president, could we suppose it in the power of any individual to effect it? or what security from an action against a public officer whose circumstances may be desperate? But such is not the genius of our constitution. The law assigns every one his duty and his rights; and for enforcing the one and maintaining the other, courts of justice are instituted. When a late president took upon him to advise and request an officer of the United States to do an act relating to foreign intercourse, which the people of the United States thought ought to have been left to that officer's own judgment, it is well remembered what a general sensation it excited; yet the general duty of the executive, to superintend the foreign intercourse of the United States, was just as strong a reason to induce the president to think himself authorized to dictate, or at least advise in that case, as the general duty to see the laws executed was in this.

The argument drawn from the liability of the officers of government to impeachment, I cannot help thinking unhappily applied in another view. If an officer attempt an act inconsistent with the duties of his station, it is presumed that the failure of the attempt would not exempt him from liability to impeachment. Should a president head a conspiracy for the usurpation of absolute power, it is hoped that no one will contend that defeating his machinations would restore him to innocence. If, in the present instance, the owner of the Resource had been ordered to be hanged, instead of ordering his vessel to be detained, and the courts of this district had rescued him from executive power, it is presumed that the attorney general would not contend, that the liability to impeachment was done away; although he would find no difficulty in showing that it was a case analogous to that of the mandamus: of the violation of that careful discrimination which is marked between the several departments by the constitution. The objection, "that this mode of proceeding takes away the right of appeal," is but slightly touched upon by the attorney general; and probably, because, in revolving the subject, he perceived that it is no objection to the exercise of jurisdiction in the circuit courts of the United States, that there is no appeal from their decisions; as they actually possess and exercise a very extensive jurisdiction without appeal. If congress thought proper, they could prescribe a form of appeal from those courts to a higher tribunal in cases of mandamus, habeas corpus, injunction in equity, or any other summary remedy. I do not know that they could, constitutionally, vest this appellate jurisdiction in the attorney general; but they certainly could in the supreme court. Some may think that this complaint, of the loss of the right of appeal, might more properly have been heard from another quarter. Congress thought that they had given the merchant the security of an appeal in case of unreasonable detention by the collector. But this benefit must, at least, have been impaired when the court to which that appeal was given, not only prejudicated every case, but on the ground of its appellate jurisdiction, swallowed up the power of the court of the first resort.

I will dismiss this subject with two additional remarks. The courts of the United States never have laid claim to a controlling power over officers vested by law with an absolute discretion, not inconsistent with the constitution; for in such a case, the officer is himself the paramount judge and arbiter of his own actions. Nor would they, for the same reason, undertake to control the acts of an officer who is a mere agent of the executive or any other department, in the performance of whatever may be constitutionally, and is by law, submitted to the discretion of that department; for in that case, the process of the court should be directed to the head of the department, or it should not issue at all. In such cases there is an evident propriety in leaving an injured individual to his action for damages; as it is only upon evidence of express malice or daring disregard to propriety, that this action could be maintained. In such a case, the authority to act is complete; but the motive is censurable. The courts will not interfere to prevent the act; because the law authorizes it. But as the law did not authorize it for individual oppression, they will give damages to the individual who suffers by the wanton exercise of a legal power. This subject was very fully considered in the case of Marbury v. Madison [supra]; and to pursue it further, I should do little more than repeat the words of the court in that case. The discrimination between the cases in which a mandamus might, and might not issue to the secretary of state, will point out to those

who consider it, the limitation to this doctrine in the idea of the judiciary.

Had the collector, in his return to the rule of court, made a question of their jurisdiction, the grounds upon which the court assumed it, would have been before the public; and the attorney general would not have had to pass an opinion upon a decision, with the grounds of which he was unacquainted; or, had the collector merely set forth the act of congress, and declared that it was in pursuance of that law, that he caused the detention of the ship in question, the court must have refused the mandamus, because he would then have claimed that exercise of discretion which the law vested in him; and as he was accountable only to the president for his motives, there would have been no difficulty, by due management between those officers, to have eluded the process of the court. With this mode of managing a difficult affair, the collector was not totally unacquainted; for something similar to it had been done in the Case of Bollman the winter preceding. This quiet submission to judicial decision in the first instance had for its object the obtention of a legal sanction for the collector's acquiescence in the recent measures of the executive, or a legal exemption from it. Either way the judiciary had to encounter responsibility and censure. It is very possible that the court may have erred in their decision. It is enough, however, and all that a judge, who has understanding enough to be conscious of his own fallibility, can pretend to, that there existed grounds at least specious for the issuing of the mandamus. Though the laws had not vested the power, the submission of the officers of government would, at least, excuse the act of the court. There never existed a stronger case for calling forth the powers of a court; and whatever censure the executive sanction may draw upon us, nothing can deprive us of the consciousness of having acted with firmness, impartiality and an honest intention to discharge our duty. Indeed there is one remark relative to the attorney general's letter, which cannot have escaped the notice of the most superficial observer. The principal question, that on which it would seem that the executive was most interested to secure the public approbation, viz. the legality of the instructions given to the collector, is completely put aside; while the public attention is fixed upon another more abstruse and admitting of a greater variety of opinion. It may be possible to prove the court wrong in interposing its authority; but certainly establishing the point of their want of jurisdiction will not prove the legality of the instructions given to the collector. The argument is not that the executive have done right, but that the judiciary had no power to prevent their doing wrong. I cannot conclude without noticing the very obliging manner in which the attorney general concludes his letter. I hope he is sensible what a distinguished place he possesses in the esteem of that individual of the judges of this circuit, with whom he is personally acquainted. It is not the giving of his opinion, which has called forth this reply, but the publication of it.

These remarks have been withheld from the press for several weeks, from no cause but the extreme repugnance that I feel at agitating, in this manner, a question which I am sensible might, with much more dignity and relative delicacy, have been disposed of in another mode.                    William Johnson, Jun.